IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MANUFACTURER DIRECT LLC, a        )
Florida Limited Liability Co.,    )
                                  )
Plaintiff,                        )
                                  )
vs.                               )   NO. 2:05-CV-451
                                  )
DIRECTBUY, INC., an Indiana       )
Corp.,                            )
                                  )
Defendant.                        )

## OPINION AND ORDER

This matter is before the Court on the Motion for Preliminary Injunction, filed by Plaintiff, Manufacturer Direct LLC ("MD") on January 27, 2006.  For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

Defendant, DirectBuy, Inc. ("DB"), is the franchisor of the DirectBuy franchise system that allows franchisees to use the franchise system to create a buying club, whereby franchisees sell memberships to retail customers.  (Compl. ¶¶ 6, 8.)[1]  In exchange for

---

[1] The complaint, filed on December 19, 2005, is a "Verified Complaint and Jury Demand."

membership fees[2], retail customers have access to products and services, mostly related to furnishing or remodeling residential properties, directly from name-brand manufactures and local vendors at discounted prices.  (Compl. ¶ 8.)  As set forth in the Franchise Agreement between DB and MD, "[t]he essence of [DirectBuy] centers is the ability to obtain merchandise at prevailing prices from manufacturers and suppliers and to pass such savings on to their members."  (Franchise Agreement, Compl. Ex. A, § 6.02.)

Plaintiff purchased a franchise from DB on May 13, 2002, for operation of a DB franchise in West Palm Beach, Florida.  (Compl. ¶ 10.)  DB provides certain approved products and vendor services to the franchisees to sell in their area.  (Compl. ¶ 12.)  Plaintiff claims that franchisees are also encouraged to obtain relationships with local and outside-of-the-system vendors.  (Compl. ¶ 13.)  However, Defendant contends that MD was not encouraged to solicit and secure relationships with local and outside-of-the-system vendors, but was rather discouraged from doing so.  (Answ. ¶¶ 13-14.)  Plaintiff secured approximately 100 local and outside vendors to provide products and services to its members.  (Compl. ¶ 14.)

The parties' Franchise Agreement provides that Plaintiff agrees that its "Actual Service Charges will not exceed eight percent (8%) of [Plaintiff's] actual cost of purchasing merchandise for Members of

---

[2] The membership fees are not insubstantial.  Plaintiff charged members $4,460 for a two-year membership.  (Answ. ¶ 8.)

[Plaintiff's] Center."  (Franchise Agreement, § 6.10.)  Plaintiff's interpretation of this contractual language is that it cannot charge more than 8% of its "actual costs" for the products and services provided by DB and purchased by their members.  (Compl. ¶ 15.) Plaintiff claims it incurs additional expense with local and outside vendors, so that Plaintiff's "actual costs" related to those vendors and suppliers are significantly higher than the costs of goods sold. (Compl. ¶ 17.)  Plaintiff admits that it "has, on occasion, charged more than 8% over costs of goods sold, but have not, upon information and belief, charged more than 8% over Plaintiff's actual costs." (*Id.*)

Fran Golden, co-owner of MD, testified at the hearing held on February 2, 2006, that MD's actual costs are greater than the cost of goods sold for the sale of customized cabinetry when a local or outside vendor is used.  Golden testified that the actual cost of purchasing customized cabinetry from an outside or local vendor includes the added expense of the design done by a MD certified designer employee, and could also be part of outside installation costs.  MD believes this added expense drove up MD's "actual cost of purchasing," and that the additional charges MD made on customized cabinetry from outside vendors was necessary and proper for them to charge to their members.  These markups paid by MD members for customized cabinetry range from 20% - 30% (Def.'s Exs. 1, 6, 7, 8, 9), and Plaintiff's counsel represented at the hearing that these

-3-

overcharges made in conjunction with custom design kitchens totaled approximately $70,000.

In contrast, DB believes MD has violated the Franchise Agreement by charging markups on customized cabinetry. DB points to Section 1.04 which defines "Actual Service Charges" as:

> The gross amount [Plaintiff] charge[s] to members of [Plaintiff's] Center for any products or services whatsoever, including charges for the submission and processing of merchandise orders and handling of merchandise, but excluding (1) [membership fees]; (b) [sales taxes] and (c) payment for the purchase of merchandise at [Plaintiff's] actual cost of purchasing such merchandise; and (d) freight charges.

(Franchise Agreement, § 1.04.) DB claims MD violated this section of the franchise agreement, as well as Florida law, when MD charged members an undisclosed and unauthorized markup of up to 30% on the customized cabinetry from local/outside vendors.

After DB discovered these overcharges or markups during a routine audit, DB sent a notice to Plaintiff on December 9, 2005. The letter indicated that because MD charged more than 8% over costs of goods sold for products and services offered by local vendors, MD had violated Section 14(j) of the Franchise Agreement. (Compl. ¶ 31; Compl. Ex. C.) DB indicated in the letter that it believed MD committed fraud and misrepresentation to its members, and violated the Florida Buying Club law, by selling merchandise from local vendors at a markup of 30%. (Compl. Ex. C.) Additionally, DB stated it was prepared to give MD 30 days to close its center. DB subsequently

indicated that the franchise relationship between the parties would terminate on February 15, 2006.

MD claims it stopped charging the extra charges associated with the custom kitchen cabinets after it received the December 9, 2005, termination letter. However, MD has not reimbursed its members the approximately $70,000 in overcharges.

A hearing on the motion for preliminary injunction was held by this Court on February 2, 2006. Fran Golden, co-owner of MD, testified on behalf of Plaintiff at the hearing. Additionally, DB presented testimony by Janet Flanigan, an internal auditor, Scott Powell, President of DB, and Frank Ball, a Vice President of DB. Having been fully briefed by all parties, this matter is now ripe for adjudication.

DISCUSSION

To prevail on a motion for preliminary injunction, Plaintiff must show that: (1) its case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *See FoodComm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002)); *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If these conditions are met, then the Court must balance the harm to Plaintiff if the injunction is not issued against the harm to

Defendant if it is issued.  *See Barry*, 328 F.3d at 303 (citing *Storck v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).  This balancing involves a sliding scale analysis:  the greater Plaintiff's chance of success on the merits, the less strong a showing it must make that the balance of harm is in its favor.  *Id.*  Finally, the Court also considers the impact on the public interest of denying or granting relief.  *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).


Likelihood of Success on the Merits

Plaintiff claims it has a high probability of success on the merits with respect to its breach of contract claim.  Specifically, MD argues that if DB terminates the Franchise Agreement with MD on February 15, 2006, it would unilaterally cease performing under the agreement with MD.  This would be a breach of contract, claims Plaintiff, because DB has no right to unilaterally end its relationship with MD.


Franchise Agreement ¶ 14.03(j)

First, MD claims DB cannot end the franchise agreement based upon Paragraph 14(j) (prohibiting fraud), because MD did not defraud its customers or violate any buyer club law.  Paragraph 14.03 provides in pertinent part as follows:

> [the Franchiser] ha[s] the **right to terminate this agreement, effective upon delivery of notice**

-6-

> **of termination** to [the Franchisee] if [the Franchisee] or any of the [Franchisee's] Owners or Affiliates:
>
> (j) commit **fraud, violate any applicable buyer club law** or regulation, or engage in embezzlement, fraudulent conversion, misappropriation of property or similar conduct, with respect to members or prospective members of your Center, including any misuse of Merchandise Funds[.]

(Franchise Agreement, ¶ 14.03(j) (emphasis added)).  The parties do not dispute that DB's December 9, 2005, letter constituted notice of termination.  Rather, the controversy centers around whether MD committed fraud or violated any applicable buyer club law.

Preliminarily, MD claims there is no evidence that any member paid anything but "actual costs" for the products and services they received.  (Pl.'s Post-Hearing Mem. in Supp. of its Mot. for Preliminary Injunction, p. 7.)  Based upon the limited evidence before this Court at this early stage of the proceedings, this Court disagrees.  Golden admitted that MD charged its members more than the cost of custom kitchen cabinets in order to help defray the salary of MD's own employees (specifically, MD's kitchen designer).  Webster's Dictionary defines "markup" as "an amount added to the cost price to determine the selling price."  WEBSTERS NINTH NEW COLLEGIATE DICTIONARY (1986).  Thus, this Court believes there is a substantial likelihood that DB could prove at a trial that MD did indeed charge its members "markups" on custom cabinets from outside or local vendors.

Next, DB points to Section 559.3905(1) of the Florida Buying

Services Act as the "applicable buyer club law" that MD violated, thus causing a breach of section 14.03(j) of the Franchise Agreement.  That section makes it "unlawful for any buying club to fail to disclose to a prospective member **in writing**, prior to the sale of any contract for buying services: . . . (c) Any charges, such as . . . buying clubs' **markup**."  Fla. Stat. § 559.3905(1)(c).  DB contends that MD violated this provision of the Florida Buying Services Act by charging markups ranging between 20% to 30% to its members for custom cabinetry from outside vendors without giving its prospective members any written disclosure about the markups.  Documents reviewed during DB's internal audit of MD and introduced at the hearing in this case indeed seem to indicate that MD charged some customers between 20% and 30% markup on custom cabinets.  (*See* Def.'s Exs. 1, 6, 7, 8, 9.)

In response, MD contends that it gave prospective members adequate written disclosure of these charges.  It is undisputed that MD provided a disclosure document to each prospective retail member stating that:

> Our LOCAL MERCHANT MEMBER program is made up of Member's [sic] and Non-Members who own a local BUSINESS, PRODUCT, SERVICE or TRADE in Broward, Palm Beach, Martin & St. Lucie Counties.  They offer their services to DirectBuy Members at a "discounted" rate - **NOT COST**!  In the majority of cases, you will be paying builder or contractor pricing.

(Compl. Ex. B.)  Given this disclaimer, Plaintiff claims no misrepresentation was made.

DB argues that the disclosure does not constitute the required

-8-

written notice to prospective members of markups, because it does not disclose that MD was going to markup the local vendor products up to 30% and keep that markup for itself.  In response to being asked to point to where in the disclosure document MD stated it was going to add a markup of up to 30% on custom cabinetry, Golden said she thought it was implied.  Additionally, the disclaimer does not tell prospective members they would be charged more than the allowable 8%.  This Court finds it likely that the disclosure fails to comply with the Florida Buying Services Act.  Nowhere in the disclaimer does it warn prospective members about the markup the member will face should they choose to install custom cabinetry.[3]

Moreover, although Golden asserted that Plaintiff made detailed disclosures orally, the Act specifically requires that the disclosure be made in writing.  Fla. Stat. § 559.3905(1)(c).  Thus, this Court finds that, based upon the limited evidence before the Court at this time and its determination of credibility made during the hearing in this matter, there is a substantial probability that MD violated section 559.3905(1)(c) of the Florida Buying Services Act, and that DB is entitled to terminate the Franchise Agreement upon notice.

Alternatively, DB also argues that by marking up the custom cabinetry, MD also violated section 559.3905(3)(g) which makes it

---

[3]This fact is underscored by Golden herself, who testified that because MD does not know whether a prospective member will eventually use the services of an outside/local vendor for the purchase of custom cabinetry, MD cannot disclose to prospective members how much of a markup the prospective member may face.

unlawful for a Florida buying club to "[m]isrepresent a material fact or create a false or misleading impression regarding the advertising sale or promotion of a buying service or club."  Fla. Stat. § 559.3905(3)(g).  DirectBuy President, Scott Powell, testified that DirectBuy's main philosophy is for members to pay a fee to join the club, and then those members can purchase merchandise at the manufacturer's cost, without any markups.  MD paid to have DB's nationwide "infomercial" broadcasted on local Florida television, and that infomercial repeatedly represented that membership involved no retail markups.  (*See* Def.'s Ex. 10.)  Moreover, Golden testified that she played a DVD presentation made by DB to prospective members.  The Court heard several excerpts from this DVD, all stating that members will pay no retail markup and no store markups.  By participating in the national advertising campaign as well as playing the DB DVD to prospective members, it is likely that Plaintiff violated section 559.3905(g), because it likely misrepresented that members would be charged no markups (when, in reality, members were charged up to a 30% markup on custom cabinetry).

In sum, at this preliminary stage of the proceedings, this Court finds that MD likely violated at least two sections of the Florida Buying Services Act -  section 559.3905(1)(c) (by failing to provide prospective members written disclosure of the markups on kitchen cabinets), and section 559.3905(3)(g) (by creating a misleading impression by advertising).  These probable violations of applicable

-10-

buying club law would give DB the right to terminate MD's franchise immediately, upon notice.  It should be noted that under section 14.03(j), DB has the right to terminate, effective upon delivery of notice of termination, without giving MD an opportunity to cure.  Thus, MD's argument that restitution to the members is not required to cure the breach of contract is inapplicable.  In sum, this Court finds that MD has failed to prove it will likely succeed on the merits.

Franchise Agreement ¶ 14.03(m)

Alternatively, DB argues for the first time in its post-hearing briefs that MD has also failed to prove that it has a likelihood of success on the merits because, in addition to violating sections 559.3905(1)(c) and 559.3905(3)(g) of the Florida Buying Services Act, Plaintiff has also committed other violations of its Franchise Agreement which warrant termination under section 14.03(m) of the Franchise Agreement.  Section 14.03(m) provides that DB has the right to terminate if MD should "fail on 3 or more separate occasions within any period of 12 consecutive months to fail to comply with any provision of this agreement, whether or not such failure is corrected after notice is delivered to you."  (Franchise Agreement, ¶ 14.3(m).)

DB argues that MD violated the Franchise Agreement on at least three separate occasions.  First, DB claims MD had its members sign a waiver of the three-day right of recision.  (*See* Def.'s Ex. 4.) Requiring its members to sign this waiver violated Florida law,

-11-

contends Defendant.  *See* F.S.A. § 559.3903(1) ("Any person who has elected to become a member of a club may cancel such membership by giving written notice of cancellation any time before 12 midnight of the third business day"); F.S.A. § 559.3903(4) ("Rights of cancellation may not be waived or otherwise surrendered.").  DB claims a second violation of the Franchise Agreement occurred when MD failed to obtain prior approval from DB of its use of the 3-day waiver form.  Third, DB argues MD violated the Franchise Agreement when it did not obtain DB's approval for MD to use outside suppliers and vendors.

This Court notes that because it has found MD likely violated sections 559.3905(1)(c) and 559.3905(3)(g), MD has failed to show a likelihood of success on the merits regardless of whether MD also breached section 14.03(m) of the Franchise Agreement.  This Court has concerns that insufficient evidence was provided during the hearing for the Court to determine if these other breaches of the Franchise Agreement actually occurred.  For example, although Golden testified she personally did not obtain DB's permission to use outside suppliers and vendors, there is no evidence in the record that no one from MD sought and received this approval.  Moreover, because DB stated in its termination letter to MD that it was terminating MD pursuant to Paragraph 14.03(j) of the Franchise Agreement, this Court is unsure whether it would be proper to rule on a request for a preliminary injunction when DB is justifying termination for a different reason. *See Bronx Auto Mall, Inc. v. Honda Motor Co.*, 113 F.3d 329, 330 (2d

-12-

Cir. 1997) (finding pretextual reason for termination of a dealership is a false business practice). Therefore, this Court declines to make any findings regarding whether MD likely violated section 14.03(m) of the Franchise Agreement.

Adequate Remedy and Irreparable Harm

The adequate remedy and irreparable harm prongs of the test for a preliminary injunction are intertwined. If no adequate remedy exists for the harm that has occurred, then the harm is irreparable. The Seventh Circuit has stated that:

> The second preliminary injunction threshold requires [the plaintiff] to establish that it will be irreparably harmed if it does not receive preliminary relief, and that money damages and/or an injunction ordered at final judgment would not rectify that harm.

*Abbott Labs.*, 971 F.2d at 16.

A damages remedy can be inadequate for any of four reasons: (1) "[t]he damage award may come too late to save the plaintiff's business"; (2) "[t]he plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"; (3) "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected"; and (4) "[t]he nature of the plaintiff's loss may make damages very difficult to calculate.". *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (citations omitted).

Plaintiff claims if the injunction is denied, MD will suffer severe and irreparable harm. Specifically, Plaintiff claims that without the injunction, MD "will most certainly go out of business." (Mem. in Supp. of Mot. for Prelim, Injunction, p. 10.) Plaintiff cites several cases, none of which originate from the Seventh Circuit, holding that injunctive relief is appropriate in a franchise/dealer relationship because irreparable harm would be caused when the business' viability is endangered. *See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382-83 (6th Cir. 1995) (finding injunctive relief appropriate where the potential economic loss is so great as to threaten the existence of the movant's business); *Heck Implement, Inc. v. Deere & Co.*, 926 F. Supp. 138, 140 (W.D. Mo. 1996) (recognizing that "even assuming [Plaintiff's] ability to limp along as a crippled former dealership, very considerable irreparable harm would occur"); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995) (remanding the case and finding where threatened loss of profits from changes in distribution system were of such magnitude as to endanger viability of business, injunction might be appropriate). In response, DB argues that Plaintiff has only been a franchisee since late 2002, thus is not an established dealer, like the cases cited by Plaintiff. Further, the plaintiff in *Heck* wanted to remain in business. In this case, it is uncontroverted that MD wishes to sell the franchise. Specifically, Golden testified it was apparent to her that DB wanted her and her partner out of the system.

She also stated she had no future plans to be involved in any other buying clubs.

Upon consideration, this Court finds that MD has failed to demonstrate that immediate and irreparable harm will result to Plaintiff if a preliminary injunction is not granted.  This Court fails to see, and MD has not adequately demonstrated, why MD would not have a quantifiable remedy at law for any losses it may incur.  *See, e.g., Gateway Eatern Ry. Co. v. Terminal R.R. Assoc. of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (noting that economic loss generally will not sustain an injunction); *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2nd Cir. 1979), *superseded on other grounds by statute*, *Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) (damages resulting from the loss of customers are provable, recoverable at law, and therefore not grounds for a preliminary injunction).[4]

Plaintiff also cites numerous cases (none from the Seventh Circuit, however), finding that when a franchiser threatens to take time, effort and money creating jobs, goodwill, and prospective profits, all tied to the use of the franchiser's trade name and system attributes, irreparable harm with no adequate remedy at law, may

---

[4] MD argues that because section 18.05 of the Franchise Agreement provides that MD waives claims for consequential damages, any harm would be irreparable.  But because Plaintiff also argues this section is unenforceable, and fails to contend that the value of MD's lost business constitutes "consequential damages," the Court finds this argument unpersuasive.

result.  Notably, Golden testified that she has been trying to sell the franchise since last April, 2005, and that she would have been satisfied to sell the franchise for $1.675 million, which she claims a purchaser offered to pay for the franchise in May, 2005.  This exemplifies the fact that MD does have an adequate remedy at law - monetary damages, which can be readily calculated.

Plaintiff claims because its whole operation is bound up with the name "DirectBuy," the loss of the ability to use that trademark would irreparably harm the goodwill MD has created, which cannot be remedied at law.  However, a company's goodwill can be compensable in money damages.  *See Clemente v. Pearle Vision, Inc.*, 762 F. Supp. 1518, 1519-20 (D. Me. 1991).  Moreover, as aptly stated by the Court in *Jiffy Lube*:

> To the extent that the [terminated franchisees] suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct.  As such, it is not the type of harm from which we seek to protect a defendant.  While a court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interests, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.

*Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 693 (D.N.J. 1993.)  Similarly, this Court believes that to the extent MD may suffer significant damage from the denial of the preliminary

-16-

injunction in this case, this harm is a predictable consequence of MD's likely breach of the Franchise Agreement and violations of Florida law.  Plaintiff also alleges that if the injunction is denied, MD's principals and employees will lose their jobs.  DB contends that if the employees are qualified, there is no reason to believe they cannot find future employment with whatever owner assumes responsibility for Plaintiff's former territory when Plaintiff's termination is complete.

Considering all of the evidence submitted during the hearing and the arguments set forth by the parties in their multiple briefs, this Court believes Plaintiff has failed to show it will be irreparably harmed if it does not receive a preliminary injunction, and that money damages would not rectify that harm.

Balancing The Harms

This Court could deny MD's motion for preliminary injunction solely on the basis that MD has failed to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied.  *See Sofinet*, 188 F.3d at 707 (finding absent "some likelihood of success and irreparable injury, the court's inquiry is at an end.").  However, in the interests of justice, it will briefly address the balancing of harms.

"Even where irreparable harm has been shown, the district court

must consider the relative hardship to the parties in its decision to grant or deny preliminary relief." *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) (citing *Ideal Indus. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979)). In this case, if the Court were to grant this injunction, DB could be sending a message to other franchisees that it is acceptable to charge undisclosed markups to members - which could contradict DB's nationwide advertising and could harm both the public and DB's name, goodwill, and reputation. *See, e.g., Hacienda Mexican Rest. of Kalamazoo Corp. v. Hacienda Franchise Group, Inc.*, 569 N.E.2d 661, 669-70 (Ind. Ct. App. 1991) ("The fact that franchisor would be forced to place its reputation in the hands of another with whom franchisor asserted it no longer had or desired to have a contractual relationship is evidence of irreparable harm.").

On the other hand, Golden testified that her reputation will be damaged, and her employees (approximately 15 or 16) will lose their jobs if the preliminary injunction is denied. This Court by no means intends to diminish the hardship that could affect MD's employees should they find themselves unemployed. However, this Court believes that on balance, the harm DB faces to its reputation and to the core of its management style, with its 125 franchise locations throughout the United States and Canada, outweighs the harm that MD's employees may face. Powell testified that 80% of DB's members across the nation enroll in response to DB's advertising, and it is essential that the

-18-

advertising (promoting no markups) be truthful, and that the franchisees abide by DB's basic theory of practice of charging its members no markups.  This Court believes that the balance of the harms weighs in favor of DB.

Public Interest

Plaintiff claims the public may be harmed without the injunction, because members of MD's buying club have paid thousands of dollars to be associated with Plaintiff's operation (many of whom are in the middle of remodeling), these people could also suffer irreparable harm without any adequate remedy at law.  However, DB has assuaged this concern of the Court by stating that it has the right to take over servicing Plaintiff's members and affirmatively represents to this Court that it would do so upon Plaintiff's termination as a franchisee.

CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction, is **DENIED**.


**DATED:  February 10, 2006**     **/s/RUDY LOZANO, Judge**
                                  **United States District Court**