## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| MANUFACTURER DIRECT LLC, a<br>Florida Limited Liability Co., | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| vs. | )<br>) | NO. 2:05-CV-451 |
| DIRECTBUY, INC., an Indiana<br>Corp., | )<br>)<br>) | |
| Defendant. | ) | |

### OPINION AND ORDER

This matter is before the Court on the: (1) Defendant's Motion for Judgment on the Pleadings, filed by Defendant, DirectBuy, Inc., on January 31, 2006; and (2) Plaintiff's Request for Oral Argument and Hearing on Defendant's Motion for Judgment on the Pleadings, filed by Plaintiff, Manufacturer Direct, LLC, on March 21, 2006.  For the reasons set forth below, Defendant's Motion for Judgment on the Pleadings is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** as to Plaintiff's claim for violation of the Indiana Franchise Act (Count Two) and tortious interference with a contract and/or prospective economic advantage (Count Three).  The Clerk is **ORDERED** to **DISMISS** Plaintiff's claims for violation of the Indiana Franchise Act and tortious interference with a contract and/or prospective economic advantage **WITH PREJUDICE**.  The motion is **DENIED** as to

Plaintiff's claim for breach of contract and breach of the implied covenant of good faith and fair dealing (Count One), and request for declaratory relief (Count Four).  Plaintiff's request for oral argument and a hearing is **DENIED**.


BACKGROUND

Plaintiff, Manufacturer Direct, LLC (hereinafter "MD"), filed a four-count complaint against Defendant, DirectBuy, Inc. (hereinafter "DB"), on December 19, 2005, alleging:  breach of contract and breach of the implied covenant of good faith and fair dealing (Count One), violation of the Indiana Franchise Act (Count Two), tortious interference with a contract and/or prospective economic advantage (Count Three), and requesting declaratory relief (Count Four).  This case stems from a disagreement between DB, the franchisor, and MD, the franchisee.

DB is the franchisor of the DirectBuy franchise system that allows franchisees to use the franchise system to create a buying club, whereby franchisees sell memberships to retail customers. (Compl. ¶¶ 6, 8.)  In exchange for membership fees, retail customers have access to products and services, mostly related to furnishing or remodeling residential properties, directly from name-brand manufactures and local vendors at discounted prices.  (Compl. ¶ 8.)

Plaintiff purchased a franchise from DB on May 13, 2002, for operation of a DB franchise in West Palm Beach, Florida.  (Compl. ¶

-2-

10.)

The parties' Franchise Agreement provides that Plaintiff agrees that its "Actual Service Charges will not exceed eight percent (8%) of [Plaintiff's] actual cost of purchasing merchandise for Members of [Plaintiff's] Center." (Franchise Agreement, Compl. Ex. A, § 6.10.) Plaintiff's interpretation of this contractual language is that it cannot charge more than 8% of its "actual costs" for the products and services provided by DB and purchased by their members. (Compl. ¶ 15.) Plaintiff claims it incurs additional expense with local and outside vendors, so that Plaintiff's "actual costs" related to those vendors and suppliers are significantly higher than the costs of goods sold. (Compl. ¶ 17.) Plaintiff admits that it "has, on occasion, charged more than 8% over costs of goods sold, but have not, upon information and belief, charged more than 8% over Plaintiff's actual costs." (*Id.*)

DB alleges MD violated the Franchise Agreement by charging unauthorized markups. (Answer, ¶ 17.) Section 1.04 defines "Actual Service Charges" as:

> The gross amount [Plaintiff] charge[s] to members of [Plaintiff's] Center for any products or services whatsoever, including charges for the submission and processing of merchandise orders and handling of merchandise, but excluding (1) [membership fees]; (b) [sales taxes] and (c) payment for the purchase of merchandise at [Plaintiff's] actual cost of purchasing such merchandise; and (d) freight charges.

(Franchise Agreement, Compl. Ex. A, § 1.04.) DB sent a notice to

-3-

Plaintiff on December 9, 2005, indicating that because MD charged more than 8% over costs of goods sold for products and services offered by local vendors, MD had violated Section 14(j) of the Franchise Agreement.  (Compl. ¶ 31; Compl. Ex. C.)  DB also indicated in the letter that it believed MD committed fraud and misrepresentations to its members, and violated the Florida Buying Club law, by selling merchandise from local vendors at a markup of 30%.  (Compl. Ex. C.)

DISCUSSION

A motion for judgment on the pleadings under Rule 12(c) "is reviewed under the same standard as a motion to dismiss under Rule 12(b):  the motion is not granted unless it appears beyond doubt that the plaintiff can prove no facts sufficient to support his claim for relief, and the facts in the complaint are viewed in the light most favorable to the non-moving party." *Flenner v. Sheahan*, 107 F.3d 459, 461 (7th Cir. 1997); *see also Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989).  In ruling on a motion for judgment on the pleadings, the Court must "accept all well-pleaded allegations as true" and view them in the light most favorable to the non-moving party, as well as accept as true all reasonable inferences to be drawn from the allegations. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).  A court may rule on a judgment on the pleadings under Rule 12(c) based upon a review of the pleadings alone, which include the complaint, the answer, and any written instruments

-4-

attached as exhibits.  *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South* Bend, 163 F.3d 449, 452 (7th Cir. 1998).


   <u>Breach of Contract</u>

   DB argues that because MD "admitt[ed] that it did in fact charge its members more than the 8% maximum service charge after making representations to the members to the contrary," MD committed fraud and violated the Florida Buying Services Act.  (Def.'s Mem. in Supp. of Mot. for J. on the Pleadings, p. 7.)  Therefore, DB claims termination of the contract was justified under section 14.03(j) of the Franchise Agreement, and MD's claim for breach of contract thereby fails as a matter of law.  Section 14.03 provides in pertinent part as follows:

> [the Franchiser] ha[s] the **right to terminate this agreement, effective upon delivery of notice of termination** to [the Franchisee] if [the Franchisee] or any of the [Franchisee's] Owners or Affiliates:
>
> (j) commit **fraud, violate any applicable buyer club law** or regulation, or engage in embezzlement, fraudulent conversion, misappropriation of property or similar conduct, with respect to members or prospective members of your Center, including any misuse of Merchandise Funds[.]

(Franchise Agreement, Compl. Ex. A, § 14.03(j) (emphasis added)).

   Contrary to DB's assertion, MD does not admit in the complaint that it committed fraud, nor does it admit that it violated the Florida Buying Services Act.  Rather, MD has pled that although it

agreed not to charge more than 8% of its "actual costs," that phrase is not defined in the Franchise Agreement, and "Plaintiff has consistently charged no more than 8% over the cost of goods sold" for "in system" vendors and products. (Compl. ¶¶ 15, 16.) Although Plaintiff admits to charging, on occasion, more than 8% over the costs of goods sold for some local and outside vendors and supplies, Plaintiff claims its "actual costs" related to the local and outside vendors are higher, thus, MD alleges it did not charge more than 8% over its "actual costs," and did not violate the Franchise Agreement. (Compl. ¶ 17.)

With regard to the alleged violation of the Florida Buying Services Act, the Act provides in pertinent part that it is "unlawful for any buying club to fail to disclose to a prospective member in writing, prior to the sale of any contract for buying services: . . . (c) Any charges, such as . . . buying clubs' markup." Fla. Stat. § 559.3905(1)(c). Additionally, section 559.3905(3)(g) provides that it is unlawful for a buying club to "[m]isrepresent a material fact or create a false or misleading impression regarding the advertising sale or promotion of a buying service or club." Fla. Stat. § 559.3905(3)(g). MD pleads that it disclosed to each member that, with regard to local and outside vendors, it would provide products and services at a discount, but would not provide such products and services "at cost." (Compl. ¶ 18; *see also* Disclosure Statement, Compl. Ex. B.) Additionally, a Disclosure Statement, allegedly

provided to each prospective retail member, provided that:

> Our LOCAL MERCHANT MEMBER program is made up of
> Member's [sic] and Non-Members who own a local
> BUSINESS, PRODUCT, SERVICE or TRADE in Broward,
> Palm Beach, Martin & St. Lucie Counties.  They
> offer their services to DirectBuy Members at a
> "discounted" rate - **NOT COST**!  In the majority of
> cases, you will be paying builder or contractor
> pricing.

(Compl. Ex. B.)  Viewing the allegations in the light most favorable to MD, the Court finds that MD has adequately pled that it did not mislead members of the public, and that it gave proper written disclosure to its prospective members.

Accepting as true MD's allegations and all reasonable inferences to be drawn therefrom, and viewing them in the light most favorable to MD, as this Court must at this stage in the proceedings, this Court finds that MD's allegations in the complaint sufficiently allege that DB breached the Franchise Agreement when DB terminated the contract (and that MD did not commit fraud or violations of the Florida Buying Services Act).  Therefore, the breach of contract claim in Count One and Count Four (for declaratory relief) survive this motion to dismiss.

### Covenant of Good Faith and Fair Dealing

MD also asserts breach of the implied covenant of good faith and fair dealing in Count One, alleging that DB's termination of the Franchise Agreement was committed in bad faith.  DB moves to dismiss this claim, arguing that Indiana implies no such covenant into

-7-

contracts absent a fiduciary or an insurer/insured relationship.  MD does not contest that Indiana does not impute an implied duty of good faith and fair dealing into every contract, *see Lewis v. Methodist Hospital*, 205 F. Supp. 2d 987, 994-95 (N.D. Ind. 2002), but rather argues that section 1-203 of the Indiana Uniform Commercial Code ("U.C.C.") imposes an obligation of good faith in the performance and enforcement of contracts.  Ind. Code § 26-1-1-203.

The Franchise Agreement between the parties specifically provides that "[n]either this agreement nor the dealings of the parties pursuant to this agreement shall create any fiduciary relationship or any other relationship of trust or confidence." (Franchise Agreement, Compl. Ex. A, § 17.01.)  Thus, at first blush, MD cannot state an independent claim for the violation of an implied covenant of good faith and fair dealing because "[u]nlike many, if not most, other states, Indiana does not impute into every contract a duty of good faith and fair dealing.  Such a duty arises in limited circumstances only, such as when a fiduciary relationship exists."  *Lewis v. Methodist Hosp.*, 205 F. Supp. 2d 987, 994-95 (N.D. Ind. 2002), *judgment rev'd on other grounds* (citations omitted); *see also Allen v. Great American Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) (recognizing an implied duty of good faith and fair dealing in insurance contracts).

However, MD argues that the covenant of good faith and fair dealing is implied by the U.C.C. By its terms, the obligation of good

-8-

faith set forth in section 26-1-1-203 applies to a "contract or duty within IC 26-1." Ind. Code § 26-1-1-203. MD baldly states, without any case law in support, that the U.C.C. applies to this case because MD was required to purchase products and services supplied by DB in Indiana. However, the relationship at issue in this case is more complicated than a typical buyer/seller relationship.

Neither party has provided authority to the Court regarding whether the U.C.C. would apply to a franchise agreement that involves both goods and services. However, there is some case law to support the argument that the U.C.C. could apply to a franchise relationship. *See, e.g., Sally Beauty Co., Inc. v. Nexxus Prod. Co., Inc.*, 801 F.2d 1001, 1005-06 (7th Cir. 1986) (holding the U.C.C. applies to distributorship agreements); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir. 1979) ("Although most distributorship agreements, like franchise agreements, are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements.").

Even if applicable to this franchise relationship, the U.C.C.'s "good faith provision may not be used to override explicit contractual terms." *Frank Lyon Co. v. Maytag Corp.*, 715 F. Supp. 922 (E.D. Ark. 1989) (applying Indiana law) (holding written distributor sales agreement was not subject to the implied duty of good faith under common law or the U.C.C. because the clear language of the contract provided that the agreement could be terminated at any time after

-9-

notice).  However, the facts of this case differ from those in *Frank Lyon*.   Here,  the  Franchise  Agreement  itself  leaves  open  the possibility  that  a  covenant  of  good  faith  and  fair  dealing  may  be implied.   The Franchise Agreement provides that "if applicable law shall imply a covenant of good faith and fair dealing," DB would have no liability for exercising its discretion "in absence of such bad faith."  (Franchise Agreement, Compl. Ex. A, § 18.10.)  Thus, it seems the contract provides that if the U.C.C. implies a covenant of good faith  and  fair  dealing,  then  DB  is  bound  to  not  exercise  its discretion in bad faith.

Unfortunately,  neither  party  has  provided  this  Court  with relevant authority to establish whether the U.C.C.'s general covenant of good faith and fair dealing applies to this case, or to determine the relationship between the U.C.C. and Indiana common law, or how to reconcile  the  applicable  law  with  the  contractual  language.   This Court  will  not  develop  the  parties'  arguments  for  them.   *Tyler v. Runyon*, 70 F.3d 458, 464-65 (7th Cir. 1995) (recognizing that courts need  not  and  indeed  should  not  expend  limited  judicial  resources  in researching,  refining,  and  otherwise  fleshing  out  arguments  the parties themselves do not adequately support); *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir. 1984) (refusing to consider an argument that was briefed in a "perfunctory and undeveloped[] manner"); *Weisman v.  Weener*,  12  F.3d  84,  86  (7th  Cir.  1993)  ("[J]udges  should  be hesitant  to  wander  too  far  astray  -  in  their  search  for  the  correct

legal result - in arguments presented to them by the parties.  When judges do so, one consequence is to 'diminish the responsibility of lawyers and reduce competition among them.'") (citation omitted).

It is clear that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  At this early stage of the proceedings, the Court is faced with a potential claim for breach of the implied covenant of good faith and fair dealing.  Therefore, DB's motion to dismiss breach of the implied covenant of good faith and fair dealing in Count One is denied.  The parties are free to raise this issue again during summary judgment proceedings, if any.

### Indiana Franchise Act

MD sets forth a claim for violation of the Indiana Franchise Act in Count Two, alleging "it is unlawful for a franchisor, such as DB, to terminate a franchisee without good cause."  (Compl. ¶ 52.)  DB moves to dismiss this claim, arguing that the Indiana Franchise Act does not apply to MD because it is not a franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana.

In its opposition memorandum, MD indicates it seeks damages under section 23-2-2.7-1(7) of the Indiana Franchise Act which provides in pertinent part as follows:

-11-

It is unlawful for any franchise agreement
entered into between any franchisor **and a
franchisee who is either a resident of Indiana or
a nonresident who will be operating a franchise
in Indiana** to contain any of the following
provisions:

(7)Permitting unilateral termination of the
franchise if such termination is without good
cause or in bad faith.  Good cause within the
meaning of this subdivision includes any material
violation of the franchise agreement.

Ind. Code § 23-2-2.7(1)(7) (emphasis added).  MD does not dispute that it is not a resident of Indiana - it is a Delaware corporation with its principal place of business in West Palm Beach, Florida.  (Compl. ¶ 1.)

MD does claim that it conducts business in Indiana through the Franchise Agreement, because it is "required to operate in Indiana, through required purchase of products and services supplied by DB." (Compl. ¶9.)  MD's argument that it conducted business in Indiana misses the mark.  The statute specifically provides that in order for MD to seek damages for termination without good cause, MD must either be a resident of Indiana or a nonresident who will be operating a franchise in Indiana.  Ind. Code § 23-2-2.7(1)(7).  MD did not operate a franchise in Indiana.  Rather, it purchased and operated a franchise in West Palm Beach, Florida.  (Compl. ¶¶ 10, 11.)  Thus, MD cannot state a claim for wrongful termination under the Indiana Franchise Agreement.

Alternatively, MD argues that the Franchise Agreement's choice

-12-

of law provision establishes that the Indiana Franchise Act should

apply.  The Franchise Agreement provides in relevant part as follows:

> This agreement and all issues arising from or
> relating to this agreement shall be governed by
> and construed under the laws of the State of
> Indiana, provided the foregoing does not
> constitute a waiver of your rights under any
> applicable franchise law of another state.
> Otherwise, in the event of any conflict of law,
> Indiana law will prevail, without regard to the
> application of Indiana conflict of law
> principles.

(Franchise Agreement, Compl. Ex. A, § 18.01.)   Although courts

routinely enforce contractual choice-of-law stipulations in this case,

there is nothing about the choice-of-law provision that establishes

the Indiana Franchise Act should apply in this circumstance.  MD has

provided no authority (and the Court is unaware of any), holding that

a general choice-of-law provision can extend the reach of a statute

such as the Indiana Franchise Agreement.[1] Moreover, the contract does

not provide that the parties agreed to be bound by the Indiana

Franchise Act.  Rather, section 18.01 states that the parties will

enjoy the benefits of "any applicable franchise law of another state."

But because the Indiana Franchise Act is not an "applicable franchise

law," the choice of law provision does not save MD's claim.

MD has failed to state a proper claim for relief under the

---

[1] To the contrary, the Act applies only when the franchisee
is either a resident of Indiana or a non-resident who will be
operating a franchise in Indiana, and it has been found that
franchise statutes such as Indiana's "should not be given
extraterritorial effect."  *Wright-Moore Corp. v. Ricoh Corp.*, 794
F. Supp. 844, 860 (N.D. Ind. 1991).

Indiana Franchise Act.  Therefore, dismissal of Count Two is proper.

### Tortious Interference

#### Tortious Interference With Contract

DB also moves to dismiss Count Three of the complaint, for tortious interference with MD's contractual rights and/or prospective economic advantage.  DB moves to dismiss the tortious interference claims, arguing that (1) MD has failed to allege the existence of a contract; and (2) MD failed to allege illegal conduct against DB and lack of justification.

To state a claim for tortious interference with contract, MD must allege: (1) the existence of a valid and enforceable contract, (2) the defendant's knowledge of the existence of the contract, (3) the defendant's intentional inducement of breach of the contract, (4) the absence of justification, and (5) damages resulting from the defendant's wrongful inducement of the breach.  *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994).  DB claims there is no valid and enforceable contract.  In response, MD argues that an "agreement in principle" existed, and that a contract need not be reduced to writing to be enforceable.

In reviewing MD's claim for tortious interference with contract, the following allegations in the complaint must be considered:

> After the first sale fell through, Plaintiff was
> approached by two other interested buyers who

-14-

began conversations with Ron Opper by stating
"corporate tells us that you are not trustworthy
people and that corporate is doing all they can
to facilitate a sale, but, if you are as
unreasonable as we have been led to believe, and
are expecting the moon, we are not interested.
Additionally, one of these interested purchasers
stated, "I'm cautious about trying to buy your
center because of all the negative press you are
getting as a result of corporate's differences
with you."

Despite starting off with these difficulties,
Plaintiff reached an agreement in principle with
these prospective purchasers in November 2005.
Thereafter, the prospective purchasers called to
say that DB was imposing upon them, as a
condition of transfer, a requirement that the
transferee retrofit the Plaintiff's new center
within one year, at a cost of $450,000.
(Plaintiff has _no_ obligation to retrofit or
remodel until 2011.)  Therefore, the purchaser
indicated that he would be unable to purchase
unless Plaintiff reduced its sale price by this
amount.

After Plaintiff confronted DB about this, DB
countered by slightly altering the requirement,
suggesting the purchaser could wait 2.5 years
prior to the retrofit.  However, this roadblock
was still sufficient to prevent the purchaser
from going forward.

(Compl. ¶¶ 27-30) (emphasis in original).

It is evident from the allegations in the complaint that there

was no valid and enforceable contract between MD and the "prospective

purchasers."   Although the complaint alleges an "agreement in

principle," it also establishes that no definite sale price was ever

agreed upon.  This case is similar to _Coleman v. Vukovich_, 825 N.E.2d

397 (Ind. Ct. App. 2005), in which the court affirmed the granting of

summary judgment on a claim for tortious interference with contractual

relations because there was no valid and enforceable contract where the parties had "reached the basics of an agreement," but one of the elements of the purchase was a requirement to execute a non-compete agreement. *Id.* at 403 (citing *Krieg v. Hieber*, 802 N.E.2d 938, 947 n.3 (Ind. Ct. App. 2004) (stating that a valid contract requires offer, acceptance, consideration, and manifestation of mutual assent)). Similarly, it is evident from the pleadings that no contract was reached in this case - no definite terms of sale are alleged.

MD cites *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996), for the proposition that an agreement, not reduced to writing, can still be a valid and enforceable contract. This is true, but even an oral contract "must contain terms which are definite and certain" to be enforceable. *Id.* Here, definite terms are missing from the complaint.

Alternatively, the Court finds that MD's claim for tortious interference with contract also fails because MD has not alleged that DB's conduct was intended for the sole purpose of causing injury and damage to MD. *See Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000) (citing *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989) (noting that "[t]o properly state a cause of action for intentional interference with contractual rights, a plaintiff must state more than a mere assertion that the defendant's conduct was

-16-

unjustified"; rather "the plaintiff must set forth factual allegations from which it can reasonably be inferred that the defendant's conduct was unjustified"); *Winkler*, 619 N.E.2d at 600-01 ("[t]o satisfy [the element of lack of justification], the breach must be malicious and exclusively directed to the injury and damage of another.")).

It appears from the complaint that MD's claim for tortious interference is based upon DB's imposition of the condition of transfer on the sale that the prospective purchasers retrofit the Plaintiff's new center within a certain time period, at a certain cost.  However, as DB indicates, section 13.02(c) of the Franchise Agreement provides that in the event MD wished to transfer the franchise, DB could impose "conditions . . . on the transfer . . ., including the following: . . . (c) the transferee . . . shall agree . . . to upgrade the Premises to conform to our then current image and requirements for a [DirectBuy] center." (Franchise Agreement, Compl. Ex. A, § 13.02(c).)[2]  Although MD alleges that MD had no obligation to retrofit or remodel until 2011, MD has failed to allege that DB lacked justification in requiring the remodeling as a term of the sale.  In fact, according to the language of the Franchise Agreement,

_____

[2]Additionally, the Franchise Agreement provides that "neither you [franchisee] nor any of your Owners may transfer the Franchise without our [DirectBuy's] approval and without complying with all the provisions of Section 13." (Franchise Agreement, Compl. Ex. A, § 13.01.)  The agreement also establishes that DB would approve a transfer only if it "meets all of the reasonable restrictions, requirements and conditions we [DirectBuy] impose on the transfer." (*Id*. § 13.02.)

it seems that DB was indeed entitled to impose this condition.  The
complaint also fails to set forth factual allegations from which the
Court can infer that DB's conduct in refusing to approve the sale was
directed solely at injuring MD, as opposed to a justified business
interest.  Plaintiff does not assert that DB was requiring the
potential buyer to upgrade to a false standard, or that DB was
requiring that this purchaser exceed DB's actual current image of its
centers.  For all of these reasons, MD's claim of tortious
interference with a contract is dismissed.


                  Tortious Interference with Business Relations

     MD also alleges that DB tortiously interfered with a business
relationship "as a result of the Defendant's conduct toward the
prospective purchaser." (Compl. ¶ 60.) It argues that DB intentionally
interfered with MD's attempt to sell, by telling the prospective
buyers that MD was "not trustworthy" and that MD expected "the moon"
and by imposing the retrofit condition upon the transfer.  (Compl. ¶
27.)  DB contends dismissal is proper because MD has failed to show
it acted without justification or that it engaged in any illegal
conduct.

     Under Indiana law, the elements of a claim for tortious
interference with a business relationship (or interference with
prospective economic advantage), are the same as the elements for

                                     -18-

interference with a contract, except that the existence of a valid relationship and the defendant's knowledge of the relationship are substituted for the existence of a valid contract and the defendant's knowledge of the contract. *ABN AMRO Mortgage Group, Inc. v. Maximum Mortgage, Inc.*, No. Civ. 1:04 CV 492, 2005 WL 1162889, at *17 (N.D. Ind. May 16, 2005). Thus, the elements of a claim for tortious interference with a business relationship are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship. *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000).

For the reasons set forth above, dismissal is appropriate because MD failed to assert that DB had no legitimate business justification in exercising its rights under section 13.02(c) of the Franchise Agreement, or in ensuring that its centers meet its current image. *See Winkler*, 638 N.E.2d at 1236 (holding that a defendant who is motivated in part by his own legitimate business interest is not acting in the absence of justification); *see also Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876-77 (Ind. Ct. App. 1998) (pursuing a legitimate business interest is justified).

Dismissal of this claim is appropriate for another reason as well. The complaint fails to allege that DB engaged in illegal

conduct.  With tortious interference with business relations, there is an additional element that the defendant "acted illegally by his interference."  *Furno v. Citizens Ins. Co. of America*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992) (citing *Biggs v. Marsh*, 446 N.E.2d 977, 983 (Ind. Ct. App. 1983); *see also Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003) (holding tortious interference requires some independent illegal action).  Although the Seventh Circuit has rejected the implication that only a criminal act may be "illegal conduct," *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999), unfortunately, Indiana courts have not defined "illegality."  *See Gaskins v. Vencor, Inc.*, No. IP99-1122-C-T/G, 2001 WL 300517, at *26 (S.D. Ind. Mar. 26, 2001) (stating "[i]llegality is not a term of art, and no court has defined the meaning of 'illegal' as used in this context.").

However, this Court has some guidance in determining whether MD has properly alleged that DB engaged in an illegal act.  First, in *Levee*, the Court of Appeals specifically held that defamation is not "illegal conduct" for the purpose of a claim of tortious interference with business relationship.  *Levee*, 729 N.E.2d at 222-23.  Thus, to the extent MD has pled that DB told the prospective purchasers MD was "not trustworthy" and that MD expected "the moon," this does not qualify as "illegal conduct" for the claim of tortious interference with business relations.

Additionally, it has been held that a breach of contract alone

-20-

is not sufficient "illegal conduct" for purposes of a tortious interference with business relations claim.  *See HAS, Inc. v. Bridgton, Inc.*, No. IP 98-0167-C H/G, 1999 WL 1893209, at * 16 (S.D. Ind. Sep. 20, 1999).  As Judge Simon recently noted:

> We find that reasoning persuasive because the Indiana Supreme Court has long expressed concern that tort remedies should not displace traditional contract remedies. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 822 (7th Cir. 1999).  To hold otherwise would be to "transmute the breach into the tort of tortious interference with business relations." *Jeppesen v. Rust*, 8 F.3d 1235, 1239 (7th Cir. 1993).

*Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1252 (N.D. Ind. 2005). As in *Biomet*, MD's argument is meritless because MD's claim for tortious interference with a business relationship is just another way of alleging that the wrongful conduct at issue (withholding approval of the sale, or requiring that the prospective purchaser update the center), was a breach of contract.  This Court finds nothing illegal about DB's refusal to approve the sale or imposing the retrofit as a condition to sale.  Thus, as a matter of law, DB's conduct was not "illegal" conduct, and therefore MD's claim for tortious interference with business relations must be dismissed.


Claim for Consequential Damages

     DB also asks this Court to grant judgment on MD's prayer for relief of "direct and incidental consequential damages," because the

-21-

Franchise Agreement establishes the parties "waive, to the fullest extent permitted by applicable law, the right to recover consequential damages for any claim directly or indirectly arising from or relating to this agreement."  (Franchise Agreement, Compl. Ex. A, § 18.05.) MD has failed to respond to this argument.

DB cites *General Bargain Ctr. v. American Alarm Co., Inc.*, 430 N.E.2d 407, 411-12 (Ind. Ct. App. 1982), for the general proposition that Indiana generally enforces damage limitation clauses.  The Court notes that *General Bargain Center* was decided on summary judgment, not a motion to dismiss.  Although Indiana courts recognize exculpatory clauses in contracts, "some exceptions do exist where the parties have unequal bargaining power, the contract is unconscionable, or the transaction affects the public interest . . . ."  *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1072 (Ind. Ct. App. 2001).  At this early stage of the proceedings, the Court cannot determine whether any exceptions to the general rule that damage limitations are enforced are applicable; therefore, DB's request for judgment on the prayer for relief is denied.


CONCLUSION

For the reasons set forth below, Defendant's Motion for Judgment on the Pleadings is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** as to Plaintiff's claim for violation of the Indiana Franchise Act (Count Two) and tortious interference with a contract

and/or prospective economic advantage (Count Three).  The Clerk is **ORDERED** to **DISMISS** Plaintiff's claims for violation of the Indiana Franchise Act and tortious interference with a contract and/or prospective economic advantage **WITH PREJUDICE.**  The motion is **DENIED** as to Plaintiff's claim for breach of contract and breach of the implied covenant of good faith and fair dealing (Count One), and request for declaratory relief (Count Four).  Plaintiff's request for oral argument and a hearing is **DENIED.**

**DATED:  July 26, 2006**              **/s/RUDY LOZANO, Judge**
                                       **United States District Court**